Billings, and may it please the Court. First of all, I have to apologize for my appearance. I look a little Ozarkian. I was watching the ballgame last night, took a bite out of a frozen Percy, and my bicuspid crown fell out. I may have a list as well, so please bear with me. I hope you like the outcome of the game. This case is really troubling from a defendant and defense attorney's point of view for a number of reasons. First of all, I think I want to talk about count one, because that was the letter of August 21st, 2000. And it developed after it was clear that the BIA was not going to be able to fulfill this road surfacing materials contract. The government characterized that as a claim and that it was material, and then say that it – and characterize it as a demand in their brief, and that's not accurate. And if you look at Exhibit F to the appendix, and there are a couple of drafts of that letter that occurred earlier based upon verified conversations with BIA personnel. But it starts out by saying, as per our 819th telephone conversation, ASSI, is asking for a stockpile request. It's not a demand. It's not a request for payment. And the context in which it occurred was in response to communications saying, if you want any money, then you have to put in a stockpile request. The testimony at trial was all over the board. It was very difficult to direct the answers from BIA contracting personnel. And they waffled. They would recant and then go back and reestablish. But the bottom line was that that letter wasn't a claim. It was a request to submit a stockpile request. The stockpile request, September 6, 2000, was, in fact, a claim. I don't think there's any question in anybody's mind about that. The problem that we had, of course, was the BIA was operating at a superior level of knowledge and knew that this contract would never be fulfilled at any time because they had adopted a long-term improvement program, infrastructure program, that this particular road section that was the subject of this supply agreement was actually scheduled for rebuilding in the future, and the supply contract was really temporary maintenance until they got to that point. So in the context of a stockpile request, it is a ridiculous way of handling a non-performance issue under a seasonal contract for road maintenance materials. The reason for that is that asphalt materials are not the type of materials that are subject to a stockpile request, as that term is ordinarily used in the administration of government contracts. You just don't stockpile asphalt. You either deliver it or you don't deliver it because it takes mixing. You have to mix the material and then take it to the job where it's to be applied. There is no contractor who supplies asphalt materials who will put together in a tank a mix of asphalt material. They can't do it. They need their plant resources to hold the raw materials to create the asphalt. So the stockpile request is a fiction from the very beginning. If that's true on count one, how does it affect the substance? It doesn't. There were 18-month consecutive or concurrent sentences on all three counts. It just shouldn't, you know, it shouldn't have been there. The real problem that we have is that this minority-owned business was given a preferential treatment under the Buy Indian Act, and they were encouraged to submit real short-term a proposal. And they had contract remedies, and they could have sued for a breach of contract. What I think happened here was that this was a wink and a nod arrangement. You know, you're good guys. You promised to deliver this. We decided that we didn't want to use it, couldn't use it. Why don't you make a stockpile request? We'll get you some money. And that would have been fine and dandy, and it would have gone away forever, I think. But for Dane Nelson, who was a disgruntled employee, and the fact, of course, that Ryan Zimmerman submitted a bunch of fake invoices to justify the amount of money, and the invoices were obviously flawed on their face when they were submitted to the BIA. They contained shipping invoices to places other than the Aberdeen, South Dakota plant. They showed shipping to Wyoming on a job. They had different names of trucking companies. All of that stuff was apparent. But Dane Nelson contacted a U.S. attorney in Montana and said, I have evidence of a fraud. And the U.S. attorney said, well, that's well and good. What do you got for proof? Dane Nelson, going through his attorney, says, I want immunity, but I can get you proof. And the deal is, okay, we'll give you immunity if you get proof. I can't prove that to you, but I can create that factual inference from what we developed early on. And it's not a confrontation issue, although that's the best analysis we have for that proposition. It's actually a Fifth Amendment search and seizure violation. If the U.S. attorney commissions an individual who is offering up a fraud case to secure written proof, documentation to prove that fraud case in exchange for immunity, and the guy goes out and steals it, I think the government is hooked into that illegality, that unlawful search and seizure, and they can't take advantage of it. I don't think it takes pre-knowledge on the part of the government that the guy is going to commit a theft to get the material. So what did he steal? I'm sorry? What did he steal? He took the September 6th invoice out of the business office because he had a relationship with a bookkeeper. They went in there and got it without the consent or permission of the owners. I characterize that as a theft. That's a little heavy-handed. But the insurers didn't have authority to remove it, and it does constitute a private search, I think. Didn't the government have that document anyway?  Here's why. Okay. And this is really important because there was no investigation. This thing had been put to bed. The contract was closed out. The doctrine of inevitable discovery wouldn't apply here because there was no impetus to create an investigation. It was this copy. Well, that's a different question. Was the document in the possession of the government? It was in the possession of the BIA, but it was buried, and it would not have come to light but for this inquiry through Dean Nelson and the U.S. Attorney's Office. Was there a ketam action here? Was there a what? A ketam action, a whistleblower action, other than the criminal case? No. Or at least one that you can disclose. No, there was not. No. I have to back up. There had subsequently been filed a civil action, but that was not until well after the case, the criminal case was resolved. I want to go back to the question that Judge McKeown asked to make sure I understand the response to counsel. The question was, didn't the government already have this invoice? They did, didn't they? Oh, sure, because that was what they based their stockpile, so-called stockpile payment on. My point is that that was simply buried. It was over. Nobody would have gone back to that particular deal file because it was closed out. But if he says, look, there's a problem, Dane says, there's a problem here, and I'm sure of it, the BIA could have looked in its records. The government could have had the BIA look in its records, couldn't they? So they didn't need to – they don't need anybody to get it from elsewhere. There is no way, based upon the way – the facts of this case, that the IG attached to BIA would have done an investigation simply on the say-so of Dane Nelson unless there was some positive, tangible proof that Mr. Nelson had made complaints against other employers when he got mad at them and invoked DOT investigations that proved empty. So he had a track record of making accusations, and they weren't going to take his word for it. That was the – that was one of the real problematic things that we were dealing with. The other – the other problematic thing, and I don't know how relevant this is to the legal arguments in this case, but BIA never intended to take delivery of this material, ever. My guys actually went to the BIA after the 2000 contract season, and in the contract season, construction season 2001, and say, hey, you paid us for the stockpile. Do you want your materials? Or when do you want your materials? They were never given an answer, of course, and there was never ever, ever any demand for this material. And I suppose that doesn't excuse taking money from the government that you didn't actually earn. The point is that these guys were told how to get money out of this contract that BIA never intended to perform. Now, if they – if the BIA knew that they never intended to perform and canceled the contract, then you have a whole series of contract remedies, including payment of whatever costs or losses you could associate with the contract. It was a shortcut for everybody involved. My view is that there was a reasonable standard of partial defense of entrapment. Also, I think that he should have instructed on the issue of subjective good faith, subjective reasonable belief. The people that the government was dealing with here were not sophisticated people. You shouldn't have had an objective standard at least impliedly imposed. And I think there was enough evidence, even though we didn't put on a defense, that the jury should have at least been given an opportunity to consider the defense of partial entrapment, because we did put in the evidence that this was an invitation from the BIA to submit a fictional arrangement under the contract or a stockpile arrangement. So I think we're going to have a fair amount of time to discuss the rest of the matter. Thank you. The Court will now return to the hearing for questions. Thank you. Thank you, Mr. Johnson. Thank you, Your Honor. And may it please the Court, my name is Leif Johnson. I'm an Assistant U.S. Attorney here in Billings, representing the government. And I'm going to be speaking and I want to begin by thanking the panel for allowing me to appear by video. I sincerely appreciate the accommodation. I would like to turn directly to some of the factual issues raised by the defense here. First and foremost, Mr. Stevens was using the argument that somehow this was a wink and a nod relationship with the Bureau of Indian Affairs. And in essence, that is the defense that he attempted to develop at trial. And it's simply not part of the factual record in this case. One of the issues that came out repeatedly with the government contracting witnesses was, were you expecting to receive true and correct invoices for cause in order to make this sort of partial or interim payment known as a stockpile payment? And the testimony indicated that, in fact, they were relying on these invoices as true and correct and there was no indication that there was somehow some wink and a nod relationship that would allow the defendants to submit something that was either untrue or simply an estimate. Concerning the issue that Mr. Stevens raised about Dane Nelson and whether his taking of the Dane Nelson contract from his employer ought to be somehow suppressed, and that should have come out in relationship to his communications with his attorney, I believe, is how it came up at trial. And I think there's a couple of issues that need to be raised there. First of all, if it was a cross-examination issue with regard to Mr. Nelson, he was already permanently excused at the time that this issue was raised. But more importantly, the defendant was attempting to, number one, cross Mr. Nelson with some evidence of bias, some evidence that somehow he was out to get the defendants, that he was really going to bring evidence forward and encourage the government to make this prosecution. And essentially that bias was already present in the testimony. Dane Nelson discovered this invoice with his name on it, and he was angry. And he came forward. He went to his attorney, and eventually they alerted law enforcement to that. So clearly that element of bias is already established in the record, and there was no need to breach an attorney-client confidence or to go and investigate further to raise that issue. The second point, which I find entirely strange, is that somehow we would then suppress this document. As Judge McCune noted, clearly it was already in the possession of the government. And Dane Nelson actually, the testimony in the record here was that he came in during work and asked the secretary, Kay Simon, who also testified at trial, for a copy, and she showed it to him. And so he removed it while he was working there. There was simply no evidence in the record that this was somehow a surreptitious search or a warrantless search on behalf of the government. This was pure conjecture on Mr. Stevens' part at trial. Finally, on the point that Mr. Stevens raised about whether or not the government ever actually intended to perform this contract, some of that testimony did come out at trial. There was quite a bit of testimony with the contracting officer, Mr. Zephier, about some of the options that would have been available in this case if the defendants hadn't lied. But they did. And clearly he testified that he would have accommodated their request for payment of costs or perhaps lost business opportunity. And certainly that's the type of thing that the defendants could have collected if they had properly raised some form of breach of contract claim farther down the line. But at the time that would have come up, the defendants had already submitted blatantly fraudulent documents to justify their interim or partial payment. And so our position on that, Your Honor, is that by the time that issue would have come up, the defendants had already made their choice. They had already committed to their deception. And then the last issue that I would like to raise in response to some of the statements made by Mr. Stevens really has to do with this issue of entrapment. As you know from the case law, clearly the entrapment issue is something that the judge at trial needs to weigh based upon the facts. And actually the test for that is whether or not there are rational, whether the court can, based on a rational view of the facts, whether that defense can be supported. And if, in fact, it cannot be supported, then the court is really obligated not to instruct. Here the entrapment instruction and entrapment by estoppel were introduced. Clearly entrapment involves both an inducement and a lack of predisposition on the part of the defendant. Both of those problems were not present in the facts of this case. While the defendant has insinuated through his arguments in the trial that there was somehow an inducement or a wink and a nod, it simply isn't present in the testimony. But more importantly, the focus of this entrapment instruction is on predisposition. And here clearly the defendant has shown a predisposition not only in the original submission, in the invoices, in the Exxon invoice, and in the Day-Nelson invoice, but also in that October 31st letter of 2002. He has shown a predisposition for not telling the truth. And so I think the court was in very clear and safe legal ground in refusing that instruction. The same is true of the entrapment by estoppel instruction. And there the courts have shown or held that the focus is more or less on what the government officials may have done to mislead the defendant. And once again, while the defense has portrayed this issue as somehow a misleading or a wink and a nod, those facts are simply not present in the record. The testimony of Jerry Locker on this very issue was, and I'll quote, was there any indication to you in any document or conversation that these were somehow anything other than cost invoices? No. It was my understanding they were actual costs, actual costs that were incurred by Zimmerman. Did you indicate to Mr. Zimmerman or Asphalt Supply at any time that they could submit invoices for something other than actual costs? No. The testimony at trial was very clear. The government officials in here, in fact, they asked repeatedly for actual invoices. That's what they assumed they received. They relied on those. And, in fact, there was testimony as well that they simply did not have the authority to rely on anything else. And there was no testimony to the effect that somehow they had given Mr. Zimmerman the misleading impression that somehow he could submit something that wasn't true. And I think the final point to be made on that issue is that if, in fact, a cost estimate or something other than a true cost incurred by ASSI had been submitted, why didn't it say so? Clearly here, the Exxon contract was doctored from the original. You've certainly read through the facts that show that that was a document that was a real contract, and it was blotted out and retyped with a computer to reflect a higher price and different information. The Dane Nelson contract was a blatant fraud that Zimmerman actually tried to bring Dane Nelson in on. He never hauled those loads. He wouldn't have hauled all of those loads in that amount of time, and he was never paid that amount. Clearly, this is the defendant, if he was submitting something other than actual cost, he wouldn't have gone to this kind of trouble to conceal the truth. And if the Court has no questions on any of those other issues raised in our briefs, I think I will go ahead and submit the remaining of our points on the briefs. I have one question on the sentencing issue, and that is, even though the amount is uncontested in terms of what he submitted as a claim, isn't there the possibility that he was owed some amounts because he actually had to do some legwork, if you will, with respect to fulfilling the government contract? And I'm wondering whether under, you know, this somewhat limbo that we're in under the sentencing law, but if the guidelines, if Blakely were to apply to the federal guidelines, wouldn't you need to have the jury make that actual finding so you could determine what was the foundation for the sentence, the foundational amount? You know, our position, obviously, Judge McKeown, in our briefs, was that the judge was essentially applying the legal formula from the guidelines to the facts that were proven at trial beyond reasonable doubt. The defendant clearly did raise the issue, I want to show set-offs. The problem was, and I think that the record was complete in the fact that there were no set-offs. He never, you know, the trial record did show that all of the material that would have been purchased for this contract was sold, and, in fact, it was gone by the fall and winter of that year when, in fact, they were telling us that it was still stored. But you do raise a very good point, Your Honor, and I think it raises a whole host of issues, you know, involved in the Blakely conundrum, and one of the real interesting issues here is that if we assume for the purposes of argument that the defense is right, that the base offense level here of a six is really, quote, the statutory maximum in terms of Blakely, then we have to look at the Buckland case and ask ourselves, was this really a harmless error? And I think it was because if you look at the Buckland decision, one of the reasons that the error in that case was harmless was because the court would have been obligated to apply stacking provisions, and the guidelines say, you know, if your guideline sentence exceeds the statutory maximum, then you have to stack your various counts. Well, you know, if we define statutory maximum, as the defendant suggests, as a six here, then that same provision would apply. 5G2.1 sub D would obligate the court to stack concurrent sentences on the statutory max for each of these counts, which would be six plus six plus six, which would equal 18, which is exactly what the defendant got. I just raised that for your thoughts, but I do agree. There is a real conundrum here as to what to do with these cases that went in before the Blakely decision and were sentenced while the law came down. And I think the best examples of what we can do are found in the Jordan and Buckland cases, which were an analogous situation under Apprendi. There's a question, though, whether the stacking provisions of the Buckland decision survived Blakely. So that's probably an open issue, depending on what the Supreme Court does. I agree. Okay. I don't see any further questions. Thank you, counsel, for your argument. We'll hear a rebuttal at this time, Mr. Stephens. 315. The whole thing about Exhibit 16 was a draft letter that I had requested from my clients preindictment to address the outstanding potential obligation to BIA. We had plea negotiations, and I disclosed that draft letter. And after those plea negotiations, a Rule 17c subpoena was issued to me or to my clients. Mr. Stephens? Yes. This issue was not raised in the opening argument, and I didn't hear the government respond to it. If you do wish to address it, I would be inclined to allow the government to respond. So it's quite up to you. Quite up to you. And the reason I got up here on rebuttal to talk about that is because Mr. Johnson did the same thing at trial that he's doing here, and that's showing a propensity to lie and misrepresent on a matter that was acquired through plea negotiations and or a Rule 17 subpoena. And it is true. But I would like to stop you right there to make sure I understood what you said. You're suggesting that Mr. Johnson did something today that was unprofessional and misrepresented something to the court? I just want to make sure I heard you correctly. What he did today was the same tactic he employed at trial. He took an unsent letter and used it as evidence of a propensity to lie on the part of my client, on my clients. And he articulated this in the context of the predisposition aspect of the partial defense of entrapment or entrapment defense. And I'm suggesting that he got the letter that was unsent and a draft that was in my possession first as part of a plea discussion. I just want to say I think it's, you know, maybe there's a legal issue about the validity of that letter, and that's obviously what we'll decide. But it does seem to me to be a pretty harsh accusation to suggest he did something unethical or unprofessional. I don't think that I have accused Lief Jernson of being unethical. Okay. That's why I wanted to stop you, because I heard it a little different. No. That is not my intent. All right. I think he was overly vigorous in his utilization of material that he should not have used. Just because a U.S. attorney gets overzealous, that is not shocking to our conscience, and I don't think it's an ethical violation.   He got it two ways. And the second way was through a Rule 17c subpoena that came right after our settlement negotiations, and that has been characterized as a noncompulsory disclosure of that unsent draft that I had requested to review to send to the BIA. We didn't send it to the BIA, obviously, because we got indicted, so there was no sense to it. But it was not a voluntary disclosure. The Rule 17c subpoena on its face says we are required to comply. It also says this subpoena shall remain in effect until you are granted leave to depart by the court or an authorized judicial officer. And the return that we made was an attorney's return. And in that return, we specifically stated that this return is being made without any waiver of rights, objections, or motions. So the government's suggestion that we either, A, waive the attorney-client privilege or, B, allowed the government's unfettered use of this, as Leif has so effectively utilized it throughout this case, is simply not a tenable position. The question that you have to resolve, of course, is, did the initial disclosure or compliance to the subpoena, without raising it timely at that time, constitute an implied waiver? I submit that it did not, and I submit also that it was timely waived at time of trial. In any event, that is the question. Scalia. You're over time, so if you can wrap up. Wrapping up, I thank you for your attention. And, again, next time I appear here, I'll have the teeth. Thank you for your argument. Mr. Johnson, you may respond. Your response is limited to the issue concerning the, quote, unquote, draft letter. Do you understand that? Thank you. Yes. Thank you, Your Honor. And I'll just very briefly address that. We received the document in discovery, and it was not part of the course of any plea discussions that did occur in March of 2003. I think the larger issue that we would like to keep our eye on here, and, you know, the defendant is correct in saying, look, we used that document. We did. We used it in closing argument, and it did tend to show the defendant's predisposition. It did tend to show that he was telling the same story. It did tend to complete the story, and that's why I introduced it. But the larger issue is Mr. Johnson, can I ask a question? Yes. Had you or to your knowledge anyone from the government seen that letter before the plea discussions? No, Your Honor. We were given it that basic afternoon with the other exhibits. And this was during plea negotiations. That was the purpose of your meeting, in other words. Yes. We met with the defense that day to discuss the case, and they gave us their disclosure of documents at that time. And I guess the point I would like to raise, Your Honor, is that this document, although we used it at trial, and clearly at closing, it did not go towards proving the elements of the crime. The falsity of the false claim itself and certainly the Dane Nelson and the Exxon invoices were shown and proven to be false by overwhelming and uncontested evidence from witnesses like Ralph Schertz, who said that may have been our contract at one time, but it is no longer. They altered it. Excuse me. Let me ask this, Judge Hawkins, again. Let me ask this question. If Mr. Stevens had said to you orally what are the contents of the draft letter, would you have been able to use that at trial? Your Honor, there was a – I would say yes. How about starting with a yes or a no? Yes, Your Honor, and there was a real purpose for that in this case, which I think I'd like you to understand. The purpose for having that letter in the discovery was to show that the defendants had been telling the same consistent story about whether this material was mixed, blended, and stored and later went bad. And, in fact, I will confirm for you that at our meeting that followed, you know, them giving us these documents, they said a lot of those same things. And the purpose for giving us that document in discovery was so that we would go back and realize and come to the realization that the defendants had been telling a consistent story all along on that subject. And the problem became they wanted us to see it, and the problem became at trial they had changed their defense. By that time, the defendant was basically saying the government is in on this conspiracy. It's a wink and a nod. And now suddenly they were no longer saying that this material had been mixed and stored and gone bad. So our position is that there was a real purpose for giving us that document in discovery at that time. And if I had known that the defendants were interested in asserting some privilege or some Rule 11 protection over that document, we never would have even attempted to introduce it. But they didn't raise that, even though it was on our exhibit list and theirs, and eventually incorporated it into the Court's exhibit list all the way through trial, until they realized that it was going to hurt them and that we wanted to introduce it near the end of our case in chief. You know, and given that ---- You're over your time. Why don't you quickly wrap up? That's all I have, Your Honor, unless the Court has any questions. I don't see any others. Thank both counsel for their argument. The case, as argued, will be submitted for decision, and the Court will stand in recess for the day. Thank you. Thank you.
judges: Farris, Hawkins, McKeown